**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-03584-NYW

CAROL ANN RANSAW,

      Plaintiff,

v.

MARC BORNHOFT, in his individual capacity,
CHRISTOPHER PADILLA, in his individual capacity,
UNKNOWN COLORADO STATE PATROL TROOPERS, in their individual capacities,
TYSON R. KERR, in his individual and official capacity,
MATTHEW WILLIAMS, in his individual capacity,
BRETT L. POWELL, in his individual capacity, and
UNKNOWN LOGAN COUNTY SHERIFF'S DEPUTIES, in their individual capacities,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This matter comes before the court on the following motions:

(1)    Defendants Tyson R. Kerr ("Defendant Kerr") and Matthew Williams's ("Defendant Williams" and together with Defendant Kerr, the "Sterling Defendants") Motion to Dismiss ("Sterling Defendants' Motion to Dismiss") [Doc. 61, filed September 8, 2021];

(2)    Defendant Brett L. Powell's ("Defendant Powell") Motion to Dismiss ("Powell Motion to Dismiss") [Doc. 62, filed September 8, 2021]; and

(3)    Defendants Christopher Padilla ("Defendant Padilla") and Marc Bornhoft's ("Defendant Bornhoft," and together with Defendant Padilla, the "State Defendants") Motion to Dismiss Third Amended Complaint and Jury Demand ("State Defendants' Motion to Dismiss" and collectively with the Sterling Defendants' Powell Motions to Dismiss, the "Motions to Dismiss") [Doc. 63, filed September 8, 2021].

The undersigned considers the Motions pursuant to 28 U.S.C. § 636(c) and the Order of Reference dated January 29, 2021 [Doc. 22]. Briefing on this matter is concluded, and this court finds that

oral argument would not materially assist the court in its adjudication.  For the following reasons, the Sterling Defendants' Motion to Dismiss is **GRANTED**; Defendant Powell's Motion to Dismiss is **GRANTED**; and the State Defendants' Motion Dismiss is **GRANTED IN PART and DENIED IN PART**.

## BACKGROUND[1]

Plaintiff Carol Ann Ransaw ("Ms. Ransaw" or "Plaintiff") initiated this action against Marc Bornhoft ("Defendant Bornhoft"), Christopher Padilla ("Defendant Padilla," and together with Defendant Bornhoft, "State Defendants"), Unknown Colorado State Patrol Troopers, Tyson R. Kerr ("Defendant Kerr"), Matthew Williams ("Defendant Williams," and together with Defendant Kerr, "Sterling Defendants"), Brett L. Powell ("Defendant Powell"), and Unknown Logan County Sheriff's Deputies (collectively, "Defendants")[2] by filing her Complaint on December 7, 2020, alleging violations of her Fourth, Fifth, and Fourteenth Amendment rights.  *See* [Doc. 1]; *see also* [Doc. 59].  Ms. Ransaw's claims are premised on events that transpired on the evening of December 7, 2019, when Ms. Ransaw was pulled over for driving more than 30 miles over the speed limit, was subsequently arrested for driving under the influence, and was detained for approximately 48 hours at the Logan County Detention Center ("LCDC").  *See generally* [Doc. 59].

---

[1] The following facts are drawn from the Third Amended Complaint [Doc. 59] and taken as true for the purposes of the instant Motions to Dismiss.

[2] Plaintiff's original Complaint also named as defendants Stanley Hilkey, Matthew C. Packard, Logan County, the Colorado Department of Public Safety, the Colorado State Patrol, the Logan County Sheriff's Office, the State of Colorado, the Sterling Police Department, and the City of Sterling. *See* [Doc. 1].  Plaintiff subsequently filed a Second Amended Complaint [Doc. 28, filed February 9, 2021] and Third Amended Complaint [Doc. 59, filed August 25, 2021], the operative pleading in this action, which ultimately removed these entities or individuals as defendants.

## I.      Relevant Factual Background – Third Amended Complaint

Shortly after 5:00 p.m. on December 7, 2019, Defendant Padilla stopped Ms. Ransaw on

Highway 76 in Sterling Colorado for travelling approximately 30 miles over the speed limit.  [Doc.

59 at ¶¶ 14, 24].  Ms. Ransaw was travelling with a friend in the passenger's seat.  [*Id.* at ¶ 26].

When Defendant Padilla walked to the driver's side door to hand Ms. Ransaw a speeding citation,

Defendant Padilla smelled alcohol in the car.  [*Id.* at ¶ 28].  Defendant Padilla then investigated

the smell, including ordering Ms. Ransaw out of her vehicle, and administering a breathalyzer test

and field sobriety tests.  [*Id.* at ¶¶ 29–32, 34, 36, 39].  Ms. Ransaw verbally denied that she had

consumed alcohol.  [*Id.* at ¶¶ 29, 41].  Her breathalyzer test "revealed 0.0 alcohol" in her system.

[*Id.* at ¶ 31].

Defendant Padilla administered four field sobriety tests as well.  *See* [*id.* at ¶ 39].  Ms.

Ransaw alleges she performed the tests "satisfactorily" while Defendant Padilla characterized her

performance as a "complete failure."  [Doc. 59 at ¶¶ 36, 53].  On the "Eye-tracking" test, Ms.

Padilla does not state how she performed.  [*Id.*].  On the "30-second estimate" test, which required

Ms. Ransaw to estimate when 30 seconds had passed, she "estimated 30 seconds had transpired

when only 16 seconds had transpired"; Ms. Ransaw claims she was distracted "during this

particular assessment [by] loud traffic and loud radio transmissions" and her surrounding

environment.  [*Id.*].  On the "Heel-Toe walk" test, Ms. Ransaw alleges that she completed this test

"without error" when Defendant Padilla "finally gave clear instructions" after he initially provided

"halting and confusing instructions."  [*Id.*].  And on the "One leg stand" test—which required Ms.

Ransaw to stand on one leg while counting until instructed to stop—Ms. Ransaw began counting

from 1001 and made it to 1012 before she "slip[ped] back to 1008."  [*Id.*].  Ms. Ransaw claims

that she became "distracted at that moment by very fast and loud approaching and passing truck traffic," and that Defendant Padilla denied her request to start over.  [*Id.*].

During the tests, Ms. Ransaw explained to Defendant Padilla that "she was in the process of driving her friend from Aspen, Colorado to Ransaw's home in New York," that the two had been on the road all day, that Ms. Ransaw was tired, and she was "scared and upset by the transpiring events."  [*Id.* at ¶¶ 37–38].  Defendant Padilla informed Ms. Ransaw that she did not satisfactorily complete the field sobriety tests and that he believed Ms. Ransaw "might be under the influence of some other substance."  [*Id.* at ¶ 42].  Ms. Ransaw "denied intoxication or drug use" and informed Defendant Padilla "how upset she was and began to openly cry" during their conversation.  [*Id.*]; *see also* [*id.* at ¶ 44].

Shortly after the tests, while Ms. Ransaw was waiting at her car, Defendant Padilla called Defendant Bornhoft, a "sergeant in the Colorado State Patrol," [*id.* at ¶ 13], who was not physically present at the scene.  [*Id.* at ¶ 48].  Defendants Padilla and Bornhoft discussed the circumstances of Ms. Ransaw's stop and the results of her eye-tracking and 30-second estimate tests, which Defendant Padilla "characterized . . . as a 'complete failure.'" [*Id.* at ¶¶ 48–56].  Defendant Padilla informed Defendant Bornhoft that he (Defendant Padilla) did not feel "confident" or "right" regarding the results of Ms. Ransaw's field sobriety tests.  [*Id.* at ¶¶ 55–56].  After that conversation ended, Defendant Padilla placed Ms. Ransaw under arrest for driving under the influence.  [*Id.* at ¶¶ 57–58].  Defendant Padilla found "no alcohol and no other drugs or drug paraphernalia" when he performed a search of Ms. Ransaw's car.  [*Id.* at ¶ 59].

Sometime shortly thereafter, Defendant Padilla contacted Defendant Williams to request that he (Defendant Williams) conduct additional sobriety tests on Ms. Ransaw, to occur after Defendant Padilla transported Ms. Ransaw to the LCDC.  [*Id.* at ¶ 61].  Defendant Padilla

transported Ms. Ransaw to the Sterling Regional Medical Center to obtain a blood sample to test for other intoxicating substances. [*Id.* at ¶ 62]. While awaiting a phlebotomist, Ms. Ransaw alleges that Defendant Padilla "insisted" that she was intoxicated. [*Id.* at ¶ 63]. Defendant Padilla transported Ms. Ransaw to the LCDC after the phlebotomist drew her blood. [*Id.* at ¶ 66]. After they arrived at the LCDC, Defendant Williams completed a Drug Influence Evaluation ("DIE") of Ms. Ransaw. [*Id.* at ¶ 67]. The DIE sheet that Defendant Williams completed reflected that Ms. Ransaw had "bloodshot and reddened conjunctiva, normal eyelids, equal pupils, that she was able to follow stimulus, and had equal ocular tracking," and "there was minor lack of convergence of the right eye." [*Id.*]. Ms. Ransaw alleges that Defendant Williams also "ran essentially the same tests" on Plaintiff that Defendant Padilla had conducted. [*Id.* at ¶ 68]. Ms. Ransaw also alleges that she again informed Defendants Padilla and Williams "that she suffered from significant fatigue, fear, and stress" and informed Defendant Williams that "she had been using bottled oxygen to battle altitude sickness" and "she had a cold and was taking over the counter cold medication." [*Id.* at ¶¶ 71–72]. Defendant Williams ultimately concluded that Ms. Ransaw was "under the influence of cannabis." [*Id.* at ¶ 74 (quotations omitted)].

A bond of $750 was set for Ms. Ransaw's release. [*Id.* at ¶ 77]. Ms. Ransaw alleges she was "not permitted to immediately pay the bond and was denied access to her purse and telephone to retrieve cash or arrange for bond." [*Id.*]. According to Ms. Ransaw, she was "denied the opportunity . . . to effectively contact anyone that could pay her bond" and "only permitted to use the jail phone system." [*Id.* at ¶¶ 78–79]. Ms. Ransaw also alleges that part of her formal booking into the LCDC included "a strip search that was conducted by a female officer" and the toilet in Ms. Ransaw's cell "was exposed to the open area of the jail [where] male officers could see her when she disrobed to use the toilet." [*Id.* at ¶¶ 80–81]. Further, Ms. Ransaw alleges that the

computer station in her cell (from which inmates may arrange for bond) did not work, and no LCDC employees resolved this issue. [*Id.* at ¶ 83]. That night, Ms. Ransaw was eventually able to "alert" her husband that she had been arrested and was being held at the LCDC. [*Id.* at ¶ 84].

In addition, Ms. Ransaw, a vegetarian, alleges that Unknown Logan County Sheriff's Deputies denied her request for a vegetarian meal during her detention. [*Id.* at ¶ 86]. And when Ms. Ransaw responded that "she would rather not eat," the Sheriff's Deputies "threatened to place her on suicide watch if she failed to eat the meat-based meal the[y] insisted on serving her." [*Id.*]. Ms. Ransaw further alleges she was "forced to provide a urine sample for a pregnancy test." [*Id.* at ¶ 88].

On December 9, 2019, Ms. Ransaw's husband traveled to the LCDC to pay Ms. Ransaw's bond for her release from the LCDC. [*Id.* at ¶¶ 90, 92–94]. All drug-related criminal charges against Ms. Ransaw were ultimately dismissed. [*Id.* at ¶ 96]. Ms. Ransaw alleges that Defendants' actions cause her "great mental and emotional distress," including humiliation for "being forced to expose her naked body to" the Unknown Sheriff's Deputies and "being detained for a crime she did not commit." [*Id.* at ¶ 97]; *see also* [*id.* at ¶ 99].

In the Third Amended Complaint, Ms. Ransaw asserts seven claims for relief pursuant to 42 U.S.C. § 1983 against the various Defendants in their individual capacities:

1.  Violations of the Fourth and Fourteenth Amendments for Unlawful Search and Seizure, against Defendants Padilla and Bornhoft ("Claim I");

2.  Violations of the Fourth and Fourteenth Amendments for Unlawful Search and Seizure, against Defendant Williams ("Claim II");

3.   Violations of the Fourth, Fifth, and Fourteenth Amendments for Unreasonable Search and Violation of the Right of Bodily Integrity and Privacy, against the Unknown Logan County Sheriff's Deputies ("Claim III");

4.   Violations of the Fifth and Fourteenth Amendments for Interference with Payment of Bonds, against the Unknown Logan County Sheriff's Deputies ("Claim IV");

5.   Violation of the Fourteenth Amendment for Failure to train and/or supervise, against Defendant Bornhoft ("Claim V");

6.   Violation of the Fourteenth Amendment for Failure to train and/or supervise, against Defendant Kerr ("Claim VI"); and

7.   Violation of the Fourteenth Amendment for Failure to train and/or supervise, against Defendant Powell and Unknown Logan County Sheriff's Deputies ("Claim VII").

[*Id.* at ¶¶ 101–79].

## II.   Procedural History

Ms. Ransaw initiated this action on December 7, 2020 by filing a Verified Complaint and Jury Demand ("Complaint").   [Doc. 1].   This case was directly assigned to the undersigned Magistrate Judge, [Doc. 3]; and upon the consent of the Parties, the case was ultimately referred to the undersigned for all purposes pursuant to 28 U.S.C. § 636(c).   [Doc. 21; Doc. 22].   On January 12, 2021, Ms. Ransaw filed an Amended Complaint as a matter of right pursuant to Federal Rule of Civil Procedure 15(a)(1) and D.C.COLO.LCivR 15.1(a) to correct a typographical error in the original Complaint.   [Doc. 17; Doc. 18].   Ten days later, Defendants filed an Unopposed Joint Motion to Stay Discovery and Vacate the Scheduling Conference ("Motion to Stay"), seeking a stay of discovery pending resolution of then-forthcoming motions to dismiss.   [Doc. 20, filed

January 22, 2021].  In seeking a stay of discovery, Defendants represented that they planned to file motions to dismiss asserting qualified immunity, and that certain Defendants planned to assert Eleventh Amendment immunity—a jurisdictional bar to suit in federal court.  [Doc. 20].  Ms. Ransaw did not oppose the Motion to Stay.  [*Id.*].  On February 1, 2021, this court granted the Motion to Stay in light of the then-forthcoming motions to dismiss and upon application of the factors set forth in *String Cheese Incident, LLC v. Stylus Shows, Inc.*, No. 02-cv-01934-LTB-PA, 2006 WL 894955, at *2 (D. Colo. Mar. 30, 2006).  [Doc. 23].  Accordingly, no Scheduling Order has been entered in this action.

On February 9, 2021, Plaintiff filed a Second Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2).  [Doc. 28]; *see also* [Doc. 27].  The Second Amended Complaint, *inter alia*, eliminated Defendants the State of Colorado, Colorado Department of Public Safety, Colorado State Patrol, City of Sterling, Sterling Police Department, and Logan County Sheriff's Office; and removed Plaintiff's official capacity claims entirely.  [Doc. 28]; *see also* [Doc. 32 at 4 n.2 (noting that the case caption includes a typographical error, and "Plaintiff's counsel has represented . . . [that] Defendant Kerr is sued in his individual capacity only")].

Ten days later, Defendants Powell and Logan County Board of Commissioners filed a Motion to Dismiss the Second Amended Complaint.  [Doc. 29].  The Sterling Defendants filed a Motion to Dismiss the Second Amended Complaint on February 22, 2021.  [Doc. 32].  After requesting and receiving an extension of time to do so, [Doc. 30; Doc. 31], Defendants Bornhoft, Padilla, Stanley Hilkey, and Colonel Matthew C. Packard filed a Motion to Dismiss the Second Amended Complaint on March 9, 2021.  [Doc. 35].  All three of those motions invoked qualified immunity as a defense from suit and sought dismissal of Plaintiff's claims for failure to state a cognizable claim.  [Doc. 29; Doc. 32; Doc. 35].  Pursuant to this court's Order, [Doc. 34], Ms.

Ransaw was granted a uniform response deadline of March 30, 2021 to respond to the three Motions to Dismiss the Second Amended Complaint.

On March 30, 2021, this court granted Plaintiff's request for an extension of time to respond to the Motions to Dismiss the Second Amended Complaint pending resolution of Plaintiff's contemporaneously filed Motion for Partial Lift of Stay of Discovery and for Limited Discovery ("Motion for Reconsideration"). [Doc. 36; Doc. 37; Doc. 38]. The undersigned denied Plaintiff's Motion for Reconsideration and ordered Plaintiff to respond to the Motions to Dismiss the Second Amended Complaint by no later than April 21, 2021. [Doc. 40]. Plaintiff responded to the Motions to Dismiss, [Doc. 41; Doc. 42; Doc. 43], and Defendants replied, [Doc. 44; Doc. 45; Doc. 46]. On June 1, 2021, Plaintiff filed a Motion for Leave to Amend the Second Amended Complaint ("Motion to Amend"). [Doc. 48]. Defendants responded to the Motion to Amend, [Doc. 50; Doc. 51; Doc. 52], and Plaintiff replied, [Doc. 53; Doc. 54; Doc. 55].

On August 25, 2021, the court granted Plaintiff's Motion to Amend and denied the Motions to Dismiss the Second Amended Complaint as moot. [Doc. 58 at 12–13]. The Third Amended Complaint was so filed. [Doc. 59]. The court also ordered the remaining Defendants to respond to the Third Amended Complaint on or before September 8, 2021. [Doc. 58 at 13]. On September 8, 2021, Defendants filed the instant Motions to Dismiss. [Doc. 61; Doc. 62; Doc. 63]. All three of the Motions again invoke qualified immunity as a defense from suit and seek dismissal of Plaintiff's claims for failure to state a cognizable claim. [Doc. 61; Doc. 62; Doc. 63]. Ms. Ransaw responded to the Motions on September 29, 2021, [Doc. 64; Doc. 65; Doc. 66], and Defendants replied thereafter, [Doc. 67; Doc. 70; Doc. 71; Doc. 72].[3] The Motions to Dismiss are thus ripe for determination.

---

[3] On October 12, 2021, the undersigned granted the State Defendants' Unopposed Motion for Extension of Time to File a Reply [Doc. 68], and permitted the State Defendants until October 27,

## LEGAL STANDARDS

### I.      Federal Rule of Civil Procedure 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations … and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  A plaintiff may not rely on mere labels or conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "'across the line from conceivable to plausible.'" (citation omitted)).  The court must ultimately "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

---

2021 to file their Reply.  [Doc. 69].  The State Defendants submitted their Reply by the October 27, 2021 deadline, as they requested.  [Doc. 71].  The next day, however, the State Defendants filed an Amended Reply in Support of Motion to Dismiss Third Amended Complaint and Jury Demand ("Amended Reply") [Doc. 72].  The Amended Reply does not indicate why such amendment was necessary, and the State Defendants did not seek leave of court to file their Amended Reply.  Moreover, the court's review of the Amended Reply does not reveal any substantive differences between that document and the State Defendants' timely filed Reply. Accordingly, the court will not consider the Amended Reply brief in evaluating the instant Motions to Dismiss.

## II.      Qualified Immunity

The doctrine of qualified immunity protects government officials from individual liability in the course of performing their duties so long as their conduct does not violate clearly established constitutional or statutory right*s*.  *See Washington v. Unified Gov't of Wyandotte Cty.*, 847 F.3d 1192, 1197 (10th Cir. 2017).  "Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials . . . from damages actions unless their conduct was unreasonable in light of clearly established law." *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (ellipsis in original) (quotations and citation omitted).  "Once the qualified immunity defense is asserted," as Defendants have done here, "the plaintiff bears a heavy two-part burden to show, first, the defendant[s'] actions violated a constitutional or statutory right, and, second, that the right was clearly established at the time of the conduct at issue." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted). "If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).  It is within the sound discretion of a court to decide which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.  *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins*, 519 F.3d at 1249).  However, "if the right[s] were not clearly established," a court "may find qualified immunity without deciding the constitutionality of the conduct." *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017)

(citing *Pearson*, 555 U.S. at 236–42).   A constitutional right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Washington*, 847 F.3d at 1197 (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted)).   "This precedent cannot define the right at a high level of generality." *Apodaca*, 864 F.3d at 1076 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).   "Rather, the precedent must be particularized to the facts." *Id.* (citing *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)).   And although there does not need to be a "prior case[ ] with precisely the same facts," *Klen v. City of Loveland, Colo.*, 661 F.3d 498, 511 (10th Cir. 2011) (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)), the court's "inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition," *id.* (quoting *Bowling v. Rector*, 584 F.3d 956, 964 (10th Cir. 2009)).

## ANALYSIS

Ms. Ransaw asserts her claims against Defendants based on their particular conduct during her traffic stop and subsequent detention.   Accordingly, the court will address the Motions based on the chronology of the events giving rise to Plaintiff's claims. First, the court will address the State Defendants' Motion to Dismiss, which seeks to dismiss Plaintiff's claims against Defendants Padilla and Bornhoft for their conduct during her stop before her arrest and her arrest itself. *See* [Doc. 63].   Next, the court will turn to the Sterling Defendants' Motion to Dismiss, which seeks to dismiss Plaintiff's claims against Defendants Williams and Kerr for conduct that occurred at the LCDC after Ms. Ransaw was arrested. *See* [Doc. 61].   Last, the court will address Defendant Powell's Motion to Dismiss, which seeks to dismiss Plaintiff's claim against Defendant Powell for failing to train and/or supervise unidentified Logan County Sheriff's Deputies. *See* [Doc. 62].

## I.      State Defendants' Motion to Dismiss [Doc. 63]

Ms. Ransaw asserts her First Claim against Defendants Padilla and Bornhoft in their individual capacities for unlawful search and seizure in violation of the Fourth and Fourteenth Amendments. [Doc. 59 at ¶¶ 101–05]. She also asserts her Fifth Claim against Defendant Bornhoft for failure to train and/or supervise in violation of the Fourteenth Amendment. [*Id.* at ¶¶ 141–52]. In their Motion to Dismiss, the State Defendants argue that Plaintiff fails to state a plausible Section 1983 claim because Defendant "Padilla's actions were supported every step of the way by legally sufficient reasonable suspicion and probable cause." [Doc. 63 at 7]. As explained further below, with respect to Defendant Padilla, I find that Plaintiff's allegations do not support her claim that Defendant Padilla did not have a reasonable suspicion that Plaintiff was driving under the influence to justify the roadside sobriety testing or that she refused to consent to the field sobriety. However, with respect to Plaintiff's arrest, I find that, at the motion to dismiss phase, Plaintiff's allegations are at least minimally sufficient to allege that Defendant Padilla lacked probable cause for her arrest. As to Defendant Bornhoft, I find that Plaintiff fails to demonstrate that he violated the Fourth or Fourteenth Amendments, and therefore Defendant Bornhoft is entitled to qualified immunity on Plaintiff's First and Fifth Claims.

### A.      Documents Considered

The State Defendants attach two documents to their Motion to Dismiss for the court's consideration: (1) Colorado State Patrol Report and Impairment Examination Form ("Police Report"), [Doc. 63-1]; and (2) Colorado Bureau of Investigation Forensic Services Laboratory Report ("Toxicology Report"), [Doc. 63-2].

In deciding a motion under Rule 12(b)(6), the ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forsgren*, 478 F.3d at 1160. Thus,

ordinarily, a court is confined to the four corners of a pleading in determining a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, taking well-pleaded facts as true. *See Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). Should the court receive and consider materials outside the complaint, it may convert a Rule 12(b)(6) motion to a motion for summary judgment if the parties have notice of the changed status and the nonmovant responded by supplying its own extrinsic evidence. *See Alexander v. Okla.*, 382 F.3d 1206, 1214 (10th Cir. 2004). However, under Tenth Circuit precedent, a "district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941–42 (10th Cir. 2002) (citing *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir. 1997)).

Here, the State Defendants contend that Plaintiff incorporates the Police Report into the Third Amended Complaint "by extensively quoting and summarizing [the documents contained in the report] in her complaint." [Doc. 63 at 2 n.1 (citing [Doc. 59 at ¶¶ 36, 39, 42–43, 52]. As to the Toxicology Report, the State Defendants assert that "Plaintiff referenced the purported results of the Laboratory Report in ¶ 96 of the Third Amended Complaint and, thus, incorporated the report therein." [Doc. 63 at 5 n.3]. Plaintiff's Response to the State Defendants' Motion to Dismiss cites to the Police Report in support of her arguments, *see* [Doc. 64 at 3, 6–7], and does not reference the Toxicology Report at all, *see* [*id.*].

First, while the court respectfully disagrees that the Third Amended Complaint quotes "extensively" from the Police Report,[4] Defendant Padilla's observations during his encounter with Ms. Ransaw are central to the claims. In addition, Plaintiff does not dispute the authenticity of the

---

[4] Indeed, the only quotation marks included in the allegations cited by the State Defendants are the around the words "tremors" and "Romberg." *See* [Doc. 59 at ¶ 52].

Police Report, and, in fact, relies on it herself in the Response to the Motion to Dismiss.  *See* [Doc. 64 at 6].  Accordingly, the court may consider the State Defendants' Exhibit A without converting this instant Motion to Dismiss to one for summary judgment.

Second, the court declines to consider the Toxicology Report.  While the Third Amended Complaint makes a passing reference to the "blood toxicology results," [Doc. 59 at ¶ 96], that general reference does not make the Toxicology Report central to her claims.  Further, Defendants appear to reference the Toxicology Report to dispute Plaintiff's allegation that "the blood toxicology results[ ] confirmed that she was not intoxicated", [Doc. 59 at ¶ 96].  *See* [Doc. 63 at 5 ("Plaintiff's blood sample tested positive for a low level of THC, a chemical found in marijuana, and Benzoylecgonine, a metabolite of cocaine.").  However, such dispute is irrelevant for the purposes of the instant Motion.  Rather, the relevant question at this stage in the proceedings is whether Plaintiff has sufficiently stated her claims against the State Defendants; and those claims allege violations of Ms. Ransaw's constitutional rights *before* Plaintiff received the lab results contained in the Toxicology Report that was not available at the time of Plaintiff's stop or arrest.  *See* [Doc. 59 at ¶ 76].[5]  For these reasons, the court declines to consider the State Defendants' Toxicology Report.  *See, e.g., Ogden v. PNC Bank*, No. 13-cv-01620-MSK-MJW, 2014 WL 4065617, at *5 (D. Colo. Aug. 15, 2014) (declining to consider exhibits that the plaintiff did not refer to in her complaint), *aff'd*, 599 Fed. App'x. 331 (10th Cir. 2015).  The court now turns to the State Defendants' arguments.

---

[5] And given that Defendant Padilla could not have received the blood toxicology report *before* he arrested Plaintiff, the State Defendants' contention that "[t]he lab results confirm Trooper Padilla had probable cause to arrest Plaintiff," [Doc. 63 at 5], further underpins why the court's consideration of this document is unnecessary in considering the other arguments in the State Defendants' Motion to Dismiss.

**B.**     **Claim I: Unlawful Search and Seizure in Violation of the Fourth and Fourteenth Amendments Against Defendants Padilla and Bornhoft**

Plaintiff asserts her First Claim against Defendants Padilla and Bornhoft, alleging that they violated her rights under the Fourth and Fourteenth Amendments.  *See* [Doc. 59 at ¶¶ 101–05]. Plaintiff alleges that "Defendant had no probable cause or reasonable suspicion to believe that [Plaintiff] had committed any violation of the law other than speeding prior to imposing [field sobriety tests] and ultimately seizing her person pursuant to the unlawful arrest."  [Doc. 59 at ¶ 102].  Specifically, Ms. Ransaw claims that "[a]ny reasonable law enforcement officer knew or should have known of th[e] clearly established right" that "where, as here, there was only the smell of alcohol that could not be tied to the Plaintiff, 'there was a lack of probable cause that would have allowed the officer to require Defendant to perform any roadside maneuvers.'"  [*Id*. at ¶ 104]. Plaintiff further alleges that "[t]he smell of alcohol even augmented by plaintiff's watery and glassy eyes did not give rise to probable cause supporting arrest."  [*Id.*].  Ms. Ransaw also alleges she "did not consent to the search because she was in detention and did not have the ability to leave the scene[.]"  [*Id.*].

**1.**     **Proper Constitutional Amendment**

While Ms. Ransaw alleges her search-and-seizure claim against the State Defendants under the Fourth and Fourteenth Amendments, "as long as a claim is properly brought under the Fourth Amendment, a plaintiff may not assert a substantive or procedural due process claim under the Fourteenth Amendment." *Asten v. City of Boulder*, 652 F. Supp. 2d 1188, 1206 (D. Colo. 2009) (citing *Pino v. Higgs,* 75 F.3d 1461, 1469 (10th Cir. 1996) ("[Plaintiff's] claim that she was unreasonably detained and transported must be brought under the Fourth Amendment.")); *see also Manuel v. City of Joliet*, 137 S. Ct. 911, 919 (2017) ("If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies

in the Fourth Amendment."). Here, this court finds that a constitutional challenge to Ms. Ransaw's stop and subsequent arrest properly arises under the Fourth Amendment. *See Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (applying the Fourth Amendment to an investigative detention and subsequent warrantless arrest); *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995); *Davis v. City of Aurora*, 705 F. Supp. 2d 1243, 1255 (D. Colo. 2010) (applying the Fourth Amendment to a claim arising from an arrest without probable cause). Thus, any distinct Fourteenth Amendment claim is not cognizable; indeed, in Response to the Motion to Dismiss, Ms. Ransaw does not argue otherwise. *See generally* [Doc. 64]; *see also Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that, when a specific constitutional amendment provides "an explicit textual source of constitutional protection," courts should analyze the constitutional claims under that amendment's standards rather than under "the more generalized notion of substantive due process" (internal quotations omitted)).

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . shall not be violated." U.S. Const. amend. IV. The "basic purpose of this Amendment" is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Ct. of City & Cty. of S.F.*, 387 U.S. 523, 528 (1967). The "ultimate touchstone" for an analysis of the constitutionality of a search or seizure under the Fourth Amendment is "reasonableness." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quotations omitted). The reasonableness of a particular search or seizure depends upon whether, objectively, the challenged action was justified under the circumstances. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735–36 (2011). The reasonableness inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's

Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotations omitted).

Here, the State Defendants seek to dismiss Plaintiff's First Claim on the basis that "Plaintiff's own allegations demonstrat[e] that Trooper Padilla had reasonable suspicion to stop and detain Plaintiff and probable cause to arrest her." [Doc. 63 at 8]. The court will address each aspect of Plaintiff's stop, sobriety testing, and arrest that she challenges as to the State Defendants.

### 2.     The Initial Stop

The reasonableness of a routine traffic stop is assessed under the principles laid out for investigative detentions in *Terry v. Ohio*, 392 U.S. 1 (1968), and the Tenth Circuit's analysis under *Terry* is two-fold. *See United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009). "First, [courts] ask whether an officer's stop of a vehicle was 'justified at its inception.'" *Id.* (citing *United States v. Valenzuela,* 365 F.3d 892, 888 (10th Cir. 2004)). "A traffic stop is justified at its inception if an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *Id.* (citing *United States v. Martinez,* 512 F.3d 1268, 1272 (10th Cir. 2008)). "Second, if a traffic stop was justified at its inception, [courts] determine whether 'the resulting detention was reasonably related in scope to the circumstances that justified the stop in the first place.'" *Id.* (quoting *Valenzuela,* 494 F.3d at 888).

Here, the Parties do not dispute that Defendant Padilla's stop of Ms. Ransaw's vehicle was justified at its inception. Indeed, Plaintiff admits she was travelling approximately 30 miles per hour over the speed limit and that it was already dark, [Doc. 59 at ¶¶ 24–25], and alleges that "Defendant had no probable cause or reasonable suspicion to believe that [Plaintiff] had committed any violation of the law *other than* speeding prior to imposing" the sobriety tests, [*id.* at ¶ 102

(emphasis added)].   Accordingly, the court focuses its analysis on the second *Terry* factor—that is, whether the resulting detention of Plaintiff, including the field sobriety testing, was reasonably related in scope to the circumstances that justified the stop in the first place.

### 3.     The Investigative Detention/Field Sobriety Testing

For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention rather than a custodial arrest.  *See United States v. Chavez*, 660 F.3d 1215, 1221 (10th Cir. 2011).   "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."  *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999) (quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983)).   In a routine traffic stop, an officer "may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation."  *United States v. Gregoire*, 425 F.3d 872, 879 (10th Cir. 2005) (citing *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004)). "Once those tasks are completed, a driver must be allowed to proceed on his way" without further delay.  *See id.*  "But an officer may detain a driver beyond the scope of the traffic stop if, during the stop, '(1) the officer develops an objectively reasonable and articulable suspicion that the driver is engaged in some illegal activity, or (2) the initial encounter becomes a consensual encounter.'" *United States v. Davis*, 636 F.3d 1281, 1290 (10th Cir. 2011) (quoting *Rosborough,* 366 F.3d at 1148; *see also Winder,* 557 F.3d at 1134 ("Although an officer may effect a stop once he observes conduct that leads him 'reasonably to conclude' that criminal conduct 'may be afoot,' termination of the encounter is required once the officer's suspicion is dispelled and probable cause fails to develop." (quoting *United States v. Peters*, 10 F.3d 1517, 1522 (10th Cir. 1993)).

The State Defendants argue that "the alcohol odor inside Plaintiff's car" justified Defendant Padilla's extension of Plaintiff's stop to perform roadside maneuvers.  *See* [Doc. 63 at

10–11].   Specifically, the State Defendants contend that Defendant Padilla had "reasonable suspicion" that Plaintiff was under the influence of alcohol.  [*Id.* at 10–11].  In her Response, Ms. Ransaw counters that Defendant Padilla did not have "probable cause" to conduct the roadside sobriety tests pursuant to "clearly established law."  [Doc. 64 at 5–8 (capitalizations omitted)]. Notably, Ms. Ransaw's argument is based on her assertion that police must have both "reasonable suspicion" and "probable cause to arrest the driver for driving under the influence" at the time of administering roadside sobriety tests.  [*Id.* at 6 ("In Colorado, the police may only administer roadside sobriety tests when they have, at the time of the tests, not only reasonable suspicion but probable cause to arrest the driver for driving under the influence.").

At the outset, the court respectfully disagrees with Plaintiff that an officer is required to have "probable cause" before administering field sobriety tests.[6]  Rather, the appropriate inquiry here is whether Defendant Padilla had an objectively reasonable and articulable suspicion that Plaintiff was driving under the influence to justify the field sobriety tests.  *See Leon v. Summit Cty.*, 755 Fed. App'x. 790, 793–94 (10th Cir. 2018) (explaining that "actions to determine whether

---

[6] Plaintiff cites to *United States v. Hopp*, 943 F. Supp. 1313, 1316 (D. Colo. 1996) to support her argument that Defendant Padilla required probable cause to conduct the roadside testing.  [Doc. 64 at 5–6].  However, *Hopp*, a criminal case, is inapplicable to the facts of this case.  Indeed, that case involved the Colorado Express Consent Law, § 42-4-1301(7), C.R.S., and the *Hopp* court explained that "[t]he [l]aw deals only with the express consent given by any driver on state roads to take a blood or breath test if a peace officer has probable cause to arrest for an alcohol driving offense." *Hopp*, 943 F. Supp. at 1316.  The court also explained that one of the officers "testified that he could not tell initially from where the odor of alcohol was coming" when he stopped the defendant, while the second officer "noticed no odor of alcohol when initially contacted by" the defendant, and "[t]here was no evidence that Defendant had major difficulties in walking, talking, or following the directives of the officers." *Id.* at 1317.  Here, Plaintiff alleges that Defendant Padilla smelled alcohol both inside and outside of Ms. Ransaw's vehicle; and that Defendant Padilla informed Plaintiff "that he thought she did not complete the sobriety tests well and he believed she might be under the influence of some other substance." *see* [Doc. 59 at ¶¶ 28–29, 42].  Accordingly, the court finds *Hopp* inapplicable to the specific facts in this case at this stage in the proceedings.

[the] [p]laintiff was intoxicated" are part of "a typical investigative detention, which does not require probable cause but can be conducted upon reasonable suspicion" and "a field sobriety test is a minor intrusion on a driver only requiring a reasonable suspicion of intoxication and an easy opportunity to end a detention before it matures into an arrest" (citation and quotations omitted)); *Wilder v. Turner*, 490 F.3d 810, 815 (10th Cir. 2007) ("Under the totality of the circumstances, the officer's observations amply support a conclusion that the officer had an objectively reasonable and articulable suspicion of criminal activity to justify detaining Plaintiff for further investigation."); *Davis*, 636 F.3d at 1290 ("But an officer may detain a driver beyond the scope of the traffic stop if, during the stop, '(1) the officer develops an objectively reasonable and articulable suspicion that the driver is engaged in some illegal activity, or (2) the initial encounter becomes a consensual encounter.'" (citation omitted)); *see also Sequeira v. McClain*, No. 15-cv-02587-PAB-MEH, 2017 WL 1197296, at *5 (D. Colo. Mar. 31, 2017) (citing *Wilder*). The determination of reasonable suspicion "does not depend upon any one factor, but on the totality of the circumstances." *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir. 1993) (citation omitted). Thus, for there to be reasonable suspicion, all that is required is that "the officer . . . must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 478 F.3d at 1115 (quoting *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000)). The evaluation of whether an officer has a "particularized and objective basis for suspecting legal wrongdoing" is made "from the perspective of the reasonable *officer*, not the reasonable person." *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003) (emphasis in original) (internal quotation marks omitted).

The court finds that, even taking the allegations in the Third Amended Complaint as true, Plaintiff fails to plausibly allege the absence of Defendant Padilla's reasonable suspicion to

conduct the roadside sobriety tests.[7]  *See Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1206–07 (10th Cir. 2008) ("Under the reasonable suspicion standard, a police officer 'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.' A reasonable suspicion analysis is based upon the 'totality of the circumstances,' and 'officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" (alterations and citations omitted)).  Ms. Ransaw cites to *Vondrak*—the case cited in the State Defendants' Motion to Dismiss to support the "reasonable suspicion" standard, *see* [Doc. 63 at 9, 11, 17]—to argue that the State Defendants' reliance upon that case is erroneous.  [Doc. 64 at 7]. Specifically, Ms. Ransaw argues that the *Vondrak* court "did not find that the smell of alcohol (or even the addition of red eyes) creates reasonable suspicion to conduct field sobriety tests" but, instead, "the defendant in *Vondrak* admitted to the arresting officer that she 'had one beer three hours ago;' and it was *this* affirmative admission that gave the officer the reasonable suspicion to conduct the field sobriety tests.'"  [*Id.* at 7–8 (citing *Vondrak*, 535 F.3d at 1207).

The court finds Plaintiff's arguments unpersuasive.  While the *Vondrak* court explained that the plaintiff's "statement that he 'had one beer three hours ago' provided [the officer] with reasonable suspicion to conduct the field sobriety tests," *Vondrak*, 535 F.3d at 1207, the smell of alcohol from the plaintiff's car was not at issue in that case, as Ms. Ransaw claims.  *See* [Doc. 64

---

[7] Indeed, as explained above, "[a] traffic stop is justified at its inception if an officer has (1) probable cause to believe a traffic violation has occurred, <u>or</u> (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction."  *See Winder*, 557 F.3d at 1133 (emphasis added).

at 7 (stating the *Vondrak* court "did not find that the smell of alcohol (or even the addition of red eyes) creates reasonable suspicion to conduct field sobriety tests")].[8]

In Response to the Motion to Dismiss, Ms. Ransaw also claims that the search was not consensual under *United States v. Coffey* and that she was detained because Defendant Padilla retained possession of her driver's license.  *See* [Doc. 64 at 8 (citing *United States v. Coffey*, 04-40139-01-RDR, 2005 WL 1799197 (D. Kan. Apr. 18, 2005))]; *see also* [Doc. 59 at ¶ 28]. However, the *Coffey* court explained that "[a] defendant who voluntarily consents to a search waives his Fourth Amendment rights, and the police officer may conduct the search without probable cause or a warrant."  2005 WL 1799197, at *4 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 235 (1973)). The *Coffey* court went on to find that the plaintiff gave his consent freely as he "agreed to the search of his vehicle without hesitation[,]" the officer "made a polite request" to search the vehicle and the plaintiff "readily agreed" to the search, the officer "did not use a commanding voice or communicate in any way that consent was required."  *Id.*   Under those circumstances, the court found "that the consent was voluntary and thus the search was legal."  *Id.*

Ms. Ransaw does not allege in the Third Amended Complaint that she did not consent to the field sobriety tests.  Rather, she alleges that she "could not leave the scene because Padilla still had possession of her driver's license and she *believed* she could not refuse either of the tests." [Doc. 59 at ¶ 33 (emphasis added) (capitalization omitted)].  Ms. Ransaw does not, however, allege any facts to support why she believed she could not refuse the field sobriety tests, such as whether Defendant Padilla requested the tests by using a commanding tone or other gestures that left Ms. Ransaw under the impression that she had no choice but to consent to the tests. *See Coffey*, 2005

---

[8] Notably, the *Vondrak* court held that the plaintiff's admitting to alcohol consumption provided the officer "reasonable suspicion necessary to perform the field sobriety tests—or, at the very least, the arguable reasonable suspicion entitling her to qualified immunity." *Vondrak*, 535 F.3d at 1207.

WL 1799197, at *4.[9]  Accordingly, I find that Plaintiff's allegations, when viewed in the light most favorable to her, do not support her claim that Defendant Padilla did not have a reasonable suspicion that Plaintiff was driving under the influence to justify the roadside sobriety testing or that she refused to consent to the field sobriety tests.

In sum, I find that Ms. Ransaw's speeding, the smell of alcohol in the car, and the continued smell of alcohol outside of the car constituted reasonable suspicion that Ms. Ransaw was driving under the influence to justify Defendant Padilla's subsequent field sobriety testing and that Ms. Ransaw has failed to sufficiently allege facts to undermine that reasonable suspicion.  *See Amundsen v. Jones*, 533 F.3d 1192, 1200 n.4 (10th Cir. 2008) ("We recognize that most cases addressing potential Fourth Amendment violations arising from traffic stops for suspicion of driving under the influence will involve additional indicia of intoxication beyond the suspect's driving pattern.  Simply because these indicia are often noted by officers and reviewing courts, however, does not mean that an officer must possess facts in addition to an improper driving pattern in order to reasonably suspect that the driver is under the influence of drugs or alcohol. Instead, our precedent counsels that driving conduct alone can establish reasonable suspicion of impairment, and thus, no additional indicium of intoxication is necessary to justify a roadside sobriety test." (citations omitted)); *Crease v. City of Olathe, Kan.*, 12-2304-JAR, 2013 WL 5314431, at *7 (D. Kan. Sept. 20, 2013) ("Thus, Hays had an articulable suspicion that Plaintiff was impaired based on her behavior and appearance both before and during the stop. Hays' use of the standard roadside field sobriety tests in order to confirm or dispel his reasonable suspicion of impairment did not exceed the scope of the stop."); *cf. Wilder*, 490 F.3d at 815 (finding the officer's

---

[9] The court does not pass here on whether such conduct by Defendant Padilla would have rendered as non-consensual Plaintiff's agreement to the field sobriety tests.

observations of a "moderate odor of alcohol, pinkish and watery eyes, a flushed face, unusually slow and deliberate speech, and slow hand movements" were sufficient to conclude under a totality of the circumstances analysis that "the officer had an objectively reasonable and articulable suspicion of criminal activity").

### 4.   The Arrest

In the Third Amended Complaint, Ms. Ransaw also alleges that Defendant Padilla lacked probable cause to arrest her.  *See* [Doc. 59 at ¶ 102].  A warrantless arrest does not violate the Fourth Amendment if the arrest is supported by probable cause. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008). "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  *Valenzuela,* 365 F.3d at 896 (internal quotations omitted).  To survive a motion to dismiss, a plaintiff must do more than merely allege that the officers lacked probable cause to arrest her; instead, she must allege facts to demonstrate an absence of probable cause.  *See Erickson v. Pawnee Cty. Bd. of Comm'rs.*, 263 F.3d 1151, 1154 (10th Cir. 2001).

The State Defendants argue that Defendant Padilla had probable cause to arrest Plaintiff based on his observation that Plaintiff's speech was "confused and repetitive" and her bloodshot eyes.  [Doc. 63 at 12 (citing [Doc. 59 at ¶ 43; Doc. 63-1])].  The State Defendants also point to Plaintiff's performance on the roadside sobriety tests, as alleged by Plaintiff in the Third Amended Complaint, to support Defendant Padilla's probable cause determination.  [*Id.*].  In her Response, Ms. Ransaw denies that Defendant Padilla had probable cause on the grounds that "there was no probable cause or reasonable suspicion to conduct the roadside sobriety tests" in the first place. [Doc. 64 at 8].  Ms. Ransaw also argues that the Third Amended Complaint supports a finding that

Defendant Padilla lacked probable cause.  *Id.*  Specifically, in the Third Amended Complaint, Ms. Ransaw alleges the following with respect to Defendant Padilla's arrest:

- Defendant Padilla stopped Ms. Ransaw for speeding approximately 30 miles over the speed limit and he smelled alcohol in Ms. Ransaw's car as he was giving her the speeding citation.  [Doc. 59 at ¶¶ 24, 27–28].

- Ms. Ransaw denied drinking.  [*Id.* at ¶¶ 28–29].  She also denied the use of marijuana or related products.  [*Id.* at ¶ 44].

- Ms. Ransaw took a breathalyzer test, "which revealed 0.0. alcohol" in her system.  [*Id.* at ¶ 31].

- Defendant Padilla asked Ms. Ransaw to perform field sobriety tests, which she agreed to do.  [*Id.* at ¶¶ 32–33].

- While Plaintiff alleges she performed the tests "satisfactorily," Defendant Padilla's "report" indicated the opposite was true.  [*Id.* at ¶ 36].  Defendant Padilla also informed Plaintiff "that he thought she did not complete the sobriety tests well and he believed she might be under the influence of some other substance."  [*Id.* at ¶ 42].

- Defendant Padilla contacted Defendant Bornhoft to discuss the circumstances of Ms. Ransaw's stop and field sobriety tests, which Defendant Padilla "characterized . . . as a 'complete failure.'"  [*Id.* at ¶¶ 48–56].

- Defendant Padilla informed Defendant Bornhoft that he (Defendant Padilla) did not feel "confident" or "right" regarding the results of Ms. Ransaw's field sobriety tests. [*Id.* at ¶¶ 55–56].

- After that conversation ended, Defendant Padilla placed Ms. Ransaw under arrest for driving under the influence.  [*Id.* at ¶¶ 57–58].

As to Ms. Ransaw's first argument, she has not demonstrated that Defendant Padilla lacked reasonable suspicion to conduct the roadside testing. *See supra.* Thus, the court is not persuaded by Plaintiff's first argument—which necessarily relies upon her conclusion that Defendant Padilla lacked the reasonable suspicion to conduct the roadside tests. [*Id.*].

Ms. Ransaw's second argument, however, fares better. At this juncture, drawing all inferences in favor of Ms. Ransaw, the court finds that Plaintiff has sufficiently alleged in the Third Amended Complaint that Defendant Padilla lacked probable cause to arrest her. "[P]robable cause is measured against an objective standard[,]" with the "primary concern being whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." *Valenzuela,* 365 F.3d at 896 (quotations and citation omitted). An officer is not permitted to form probable cause based on one fact, to the exclusion of all other facts available to them. *See Davis,* 705 F. Supp. 2d at 1261. Here, it is undisputed that Defendant Padilla had administered a breathalyzer test that Ms. Ransaw passed with a 0.0. [Doc. 59 at ¶ 47; 63-1 at 3]. Ms. Ransaw also alleges that Defendant Padilla performed a search of the vehicle that revealed no alcohol and no other drugs or drug paraphernalia. [Doc. 59 at ¶ 59]. She further contends that that Defendant Padilla admitted that roadside tests "suck," and that "the real reason he believed [Plaintiff] is intoxicated" is that he "just has a feeling." [*Id.* at ¶ 53 (internal quotations omitted)]. In the Response, Ms. Ransaw also references the dashcam video to argue that Defendant Padilla's assessment of her conduct was inaccurate. *See* [Doc. 64 at 8 ("The dash cam video shows that Trooper Padilla's alleged observation that Ms. Ransaw's speech was confused was without basis.")]. Ms. Ransaw contends that, in these circumstances, Defendant Padilla should have afforded "significantly more weight" to her statements that she had not taken any intoxicating substances. [*Id.*].

While Defendant Padilla insists that Plaintiff's appearance—including her bloodshot eyes, the manner in which she performed the roadside maneuvers, and her confusion—gave him probable cause to believe that she was "under the influence of alcohol or drugs or both," [Doc. 63 at 12–13], taking the factual allegations in the Third Amended Complaint as true as it must, this court cannot conclude that Ms. Ransaw "can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004) (quotations and citation omitted). "By its nature, probable cause is a fact-intensive inquire, and is decided on a case-by-case basis". *See Beattie v. Smith*, No. 12-2596-JTM, 2013 WL 467297, at *5 (D. Kan. Feb. 7, 2013) (citing *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995), *aff'd*, 543 F. App'x 850 (10th Cir. 2013)). At the motion to dismiss phase, this court finds that Plaintiff's allegations are at least minimally sufficient to allege that Defendant Padilla lacked probable cause for her arrest. *See Cohen v. Busch*, No. 08-cv-02188-LTB-CBS, 2010 WL 2593937, at *8 (D. Colo. May 10, 2010), *report and recommendation adopted*, 2010 WL 2585345 (D. Colo. June 23, 2010), *aff'd in part sub nom. Cohen v. Waxman*, 421 F. App'x 801 (10th Cir. 2010).

### 5.  Clearly Established

With no argument that such a Fourth Amendment right requiring probable cause for arrest is not clearly established, *see* [Doc. 63 at 17–18], this court respectfully declines to find that qualified immunity precludes Ms. Ransaw's Fourth Amendment claim against Defendant Padilla based only upon her arrest at this stage of the case.[10]

---

[10] In so ruling, this court expressly states that it is not making a determination that Defendant Padilla lacked probable cause or that Ms. Ransaw's claim can survive summary judgment. Indeed, while the dashcam video is referenced in the Third Amended Complaint, neither Party offered it in conjunction with the State Defendants' Motion to Dismiss. *Cf. Fogarty*, 523 F.3d at 1159 ("We underscore that these conclusions regarding probable cause are compelled by our constrained jurisdiction and our view of the facts in the light most favorable to [plaintiff] . . . If defendants demonstrate [] that the arresting officers had objective reason, even if mistaken, for believing that [plaintiff violated the law], they may well be entitled to qualified immunity. But on the record

However, even accepting that Ms. Ransaw alleged sufficient facts, taken as true, to establish Defendant Bornhoft's personal participation, the State Defendants contend that he is entitled to qualified immunity even if Defendant Padilla lacked probable cause because "[a] police officer who act 'in reliance on what proves to be the flawed conclusions of a fellow police office may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable" and that there is no Supreme Court or Tenth Circuit cases law clearly establishing his reliance is unconstitutional.  [Doc. 63 at 18].  It does not appear that Plaintiff responds directly to this argument or identifies any Supreme Court or Tenth Circuit case law that would clearly establish that Defendant Bornhoft's conduct violated Ms. Ransaw's Fourth Amendment rights. *See generally* [Doc. 64].  Instead, in her response to each of the Motions to Dismiss, Plaintiff argues that "qualified immunity has no cogent legal basis and this court is not bound to apply it." [Doc. 64 at 12–18; Doc. 65 at 10–15; Doc. 66 at 12–18].

This court respectfully disagrees.  None of Plaintiff's arguments or authority overcome the overwhelming authority providing for qualified immunity in Section 1983 suits.  *See, e.g.*, *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (stating "qualified immunity is important to society as a whole," and "as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial" (quotations and citations omitted)).  To the extent that Plaintiff invites this court to diverge from the applicable law based on the argument that "qualified immunity has no cogent legal basis," this court respectfully declines to do so.

---

before us, we cannot at this juncture reach such a conclusion as a matter of law); *Est. of Ronquillo by & through Est. of Sanchez v. City & Cty. of Denver*, No. 16-cv-01664-CMA-KMT, 2016 WL 10843787, at *2 (D. Colo. Nov. 17, 2016), (on a motion for summary judgment, a court may reject a plaintiff's version of the events when video evidence "blatantly contradicts" that version (citing *Thomas v. Durastanti,* 607 F.3d 655, 672 (10th Cir. 2010)), *aff'd*, 720 Fed. App'x 434 (10th Cir. 2017).

It is Plaintiff's burden, after the invocation of qualified immunity, "to convince the court that the law was clearly established." *Hilliard v. City & Cty. of Denver*, 930 F.2d 1516, 1518 (10th Cir. 1991). Based on the record before it, this court concludes that Ms. Ransaw has failed to carry her burden with respect to Claim I's Fourth Amendment violation arising from her warrantless arrest against Defendant Bornhoft and thus, qualified immunity precludes such claim.

### C.  Supervisory Liability for Defendant Bornhoft

As mentioned, Ms. Ransaw also asserts her Fifth Claim against Defendant Bornhoft for failing to train and/or supervise Defendant Padilla in violation of the Fourteenth Amendment. [Doc. 59 at ¶¶ 141–52]. For individual liability under § 1983 to lie against Defendant Bornhoft, Ms. Ransaw must allege sufficient facts, taken as true, that establish an affirmative link between her alleged warrantless arrest without probable cause and Defendant Bornhoft's personal participation, his exercise of control or direction, or his failure to supervise. *See Est. of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1226 (D. Colo. 2016). To establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities, a plaintiff must sufficiently allege (1) personal involvement; (2) causation, and (3) state of mind. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

First, insofar as Ms. Ransaw fails to sufficiently allege that Defendant Padilla committed a constitutional violation arising from her initial stop or her investigatory detention, Plaintiff also cannot state a claim against Defendant Bornhoft for supervisory liability on either of those theories. *See Hinkle v. Beckham Cty. Bd. of Cty. Comm'rs*, 962 F.3d 1204, 1226 (10th Cir. 2020) ("Because Deputy Estep committed no constitutional violation, Hinkle cannot show that Sheriff Jay directed Deputy Estep to commit a constitutional violation or that Sheriff Jay acquiesced in its continuation. Hinkle's supervisory claim thus fails.").

Second, given the court's ruling that only reasonable suspicion is required to perform roadside sobriety testing, as opposed to probable cause, Plaintiff's allegation that Defendant Bornhoft failed to train Defendant Padilla to only subject citizens to such testing upon probable cause, [Doc. 59 at ¶ 143], fails as a matter of law.

Third, Plaintiff's allegations are insufficient to adequately plead either causation or Defendant Bornhoft's state of mind.  Indeed, while Ms. Ransaw alleges Defendant Padilla sought Defendant Bornhoft's advice and reflects Defendant Padilla's statements, *see e.g.*, [Doc. 59 at ¶¶ 48–56], there are no factual allegations that allow a factfinder to conclude that Defendant Bornhoft advised or ordered Defendant Padilla to arrest her.  *See generally* [Doc. 59].  While this court accepts all well-pleaded allegations in the Third Amended Complaint as true, and construes them in the light most favorable to Plaintiff, it need not accept conclusory allegations.  *See Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).

Finally, Plaintiff does not address Defendant Bornhoft's argument that "allegations of an isolated instance of a constitutional violation by a subordinate are insufficient to sustain a claim that lack of training or supervision caused a constitutional violation."  [Doc. 63 at 16]; *see also McClelland v. Facteau*, 610 F.2d 693, 697 (10th Cir. 1979) ("Showing that individual officers violated a person's constitutional rights on an isolated occasion is not sufficient to raise an issue of fact whether adequate training and procedures were provided.").  There are no allegations in the Third Amended Complaint that Defendant had any notice that Defendant Padilla's training was deficient.  *See generally* [Doc. 59].  For all these reasons, this court respectfully concludes that qualified immunity bars Claim V against Defendant Bornhoft in his individual capacity.

## II.    Sterling Defendants' Motion to Dismiss [Doc. 61]

Plaintiff asserts her Second Claim against Defendant Williams for unlawful search and

seizure in violation of the Fourth and Fourteenth Amendments, [Doc. 59 at ¶¶ 106–114]; and her Seventh Claim against Defendant Kerr for failure to train and/or supervise in violation of the Fourteenth Amendment, [*id.* at ¶¶ 153–163].

In addition to invoking qualified immunity, [Doc. 61 at ¶¶ 22, 26, 44], the Sterling Defendants seek to dismiss Plaintiff's claims on three bases.  First, they argue that Plaintiff fails to plausibly allege facts to state an unlawful search and seizure claim against Defendant Williams under the Fourth Amendment.  [*Id.* at ¶ 20].  Second, the Sterling Defendants argue that Plaintiff's claim against Defendant Williams for unlawful search and seizure under the Fourteenth Amendment "fails as any claim in this regard is exclusively governed by the Fourth Amendment and because Plaintiff had an adequate state law remedy."  [*Id.*].  Third, as to Defendant Kerr, the Sterling Defendants argue that Plaintiff fails to plausibly allege facts to "establish[ ] supervisory liability, namely that Defendant Kerr was personally involved in any constitutional violation." [*Id.* at ¶ 21]; *see also* [*id.* at ¶ 47].

## A.      Documents Considered

The Sterling Defendants attach to their Motion to Dismiss a purported copy of the Drug Influence Evaluation ("DIE") that Plaintiff references in the Third Amended Complaint for the court's consideration.  *See* [Doc. 61 at 7; Doc. 61-1]; *see also* [Doc. 59 at ¶¶ 67–68, 74].

As discussed above, a "district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen*, 287 F.3d at 941–42.  Here, the Sterling Defendants contend that the Third Amended Complaint "explicitly references the DIE and it is central to [Plaintiff's] claim against Defendant Williams."  [Doc. 61 at ¶ 31 n.2].  They also argue that "Plaintiff cannot dispute the authenticity of the DIE" because of her reliance upon it in the Third Amended Complaint.  [*Id.*]. Plaintiff's Response does not address the DIE.  *See* [Doc. 65].

The court finds that the Third Amended Complaint cites to and quotes the DIE, and those references are consistent with the DIE attached by the Sterling Defendants to their Motion to Dismiss. For instance, Plaintiff alleges that "[t]he DIE sheet . . . assessed [her] as having bloodshot and reddened conjunctiva, normal eyelids, equal pupils, that she was able to follow stimulus, and had equal ocular tracking." [Doc. 59 at ¶ 67]. The DIE provided by the Sterling Defendants represents that Defendant Williams "noticed Mrs. Ransaw's eyes were bloodshot and appeared to have a reddened conjunctiva . . . [she] had normal coordination," and her "pupil size was equal and her eyes tracked equally." [Doc. 61-1 at 3]; *see also* [*id.* at 1 (indicating that Plaintiff had "Bloodshot" eyes and "Reddened Conjunctiva" as well as normal eyelids and equal pupil size, she was able to follow stimulus, and had "Equal Tracking")]. In addition, the Third Amended Complaint also quotes directly from the DIE, despite not including the DIE as an attachment. *Compare* [Doc. 59 at ¶ 73 ("WILLIAMS notes in his initial observations of RANSAW that she was 'very polite and cooperative' and that she "had normal coordination, speech, and facial color.'") *with* [Doc. 61-1 at 3 ("Mrs. Ransaw was very polite and cooperative during the entire evaluation . . . Mrs. Ransaw had normal coordination, speech, and facial color.").

Accordingly, this court concludes it may consider the DIE without converting the Sterling Defendants' Motion to Dismiss to a summary judgment motion. In so doing, the court views the DIE in the light most favorable to Plaintiff, except where the DIE "blatantly contradicts" Plaintiff's version of events. *See Est. of Ronquillo*, 2016 WL 10843787, at *2. The court will now turn to the Sterling Defendants' substantive arguments.

### B. Claim II: Unlawful Search and Seizure in Violation of the Fourth and Fourteenth Amendments against Defendant Williams

Ms. Ransaw asserts her Second Claim against Defendant Williams, claiming that he violated her right to be free from unreasonable searches and seizures under the Fourth and

Fourteenth Amendments. *See* [Doc. 59 at ¶¶ 106–14]. Specifically, Ms. Ransaw alleges that Defendant Williams improperly conducted a search of [Plaintiff] via his drug evaluation tests without probable cause or reasonable suspicion after [Defendant] Padilla already conducted identical tests." [*Id.* at ¶ 107 (capitalizations omitted)]; *see also* [*id.* at ¶ 108]. Ms. Ransaw contends that Defendant Williams's tests violated her constitutional rights because Defendant Padilla had already administered sobriety tests to Plaintiff even though he (Defendant Padilla) had "no probable cause or reasonable suspicion" to do so in the first place. [*Id.*]. Therefore, Plaintiff asserts, "no reason existed for any further tests" by Defendant Williams; and Plaintiff claims that no such reason was "given to [her] or stated in" Defendant Padilla's or Defendant Padilla's "report[s]." [*Id.*]. Plaintiff also alleges that Defendant Williams's search was intended to "harass and intimidate" her. [*Id.* at ¶ 109]. The court will address the Sterling Defendants' arguments as to each constitutional amendment in turn.

### 1.      Fourth Amendment

As mentioned, the reasonableness of a search or seizure depends upon whether, objectively, the challenged action was justified under the circumstances. *See Ashcroft*, 563 U.S. at 736. To allege sufficient facts to support a Fourth Amendment claim for an unlawful search or seizure under Section 1983, a complaint must do more than simply allege that "no probable cause existed." *Erickson*, 263 F.3d at 1154. Instead, a complaint must allege facts tending to show an absence of probable cause. *Id.*

The Sterling Defendants move to dismiss Plaintiff's Second Claim on the basis that Plaintiff does not allege facts to plausibly show that Defendant Williams violated her Fourth Amendment rights. [Doc. 61 at ¶ 20]. The Sterling Defendants contend that Ms. Ransaw was already placed under arrest when she interacted with Defendant Williams at the LCDC, and

therefore "Defendant Williams was not obligated to re-determine probable cause when the arrest had already occurred, and his reliance on Defendant Padilla's determination was reasonable." [*Id.* at ¶¶ 28–30]. The Sterling Defendants also argue that "there is no suggestion in the Complaint or DIE that Defendant Williams knew (or should have known)" about the factors that Plaintiff alleges interfered with her performance of the field sobriety tests. [*Id.* at ¶ 32]. And even if Defendant Williams were "obligated to support his finding that Plaintiff was under the influence of cannabis with probable cause," Defendants contend, he possessed such "probable cause to support his finding." [*Id.* at ¶ 33]; *see also* [*id.* at ¶¶ 34–36]. The court respectfully agrees.

Ms. Ransaw's Fourth Amendment claim is premised on her assertions that, based on the "totality of the circumstances," Defendant Williams violated Plaintiff's "clearly established right to be free of the unreasonable search of her person and continued seizure and detention thereof without probable cause or reasonable suspicion"; and Defendant Williams therefore "prolonged [Plaintiff's] detention by wrongfully confirming her illegal seizure and arrest." [Doc. 59 at ¶ 110]. In other words, it appears to be Ms. Ransaw's position that Defendant Williams's post-arrest sobriety testing was unlawful based on Ms. Ransaw's conclusion that Defendant Padilla lacked probable cause to arrest her in the first place. *See* [Doc. 59; Doc. 65].

The court does not find that Plaintiff's allegations support her Fourth Amendment claim against Defendant Williams. There is no dispute that Defendant Williams was not the arresting officer. Plaintiff alleges that Defendant Williams merely conducted additional sobriety testing *after* Plaintiff was already placed under arrest. *See* [Doc. 59 at ¶¶ 61, 67, 70–72, 74]. In her Response to the Sterling Defendants' Motion to Dismiss, Ms. Ransaw argues that she states a claim under the Fourth Amendment on the basis that she "alleg[es] that Officer Williams had no legal basis to administer redundant tests upon Plaintiff." [Doc. 65 at 2]. Ms. Ransaw also contends that

Defendant Williams had no cause for conducting the additional tests on Plaintiff under "clearly established law," and cites to *Bell v. Wolfish*, 441 U.S. 520, 559 (1979) and *Latta v. Fitzharris*, 521 F.2d 246, 252 (9th Cir. 1975) in support of her arguments. [*Id.* at 5–7]. However, Ms. Ransaw fails to explain, and the court's review of those cases does not reveal, how those cases "clearly establish[ ]" the constitutional right that she claims Defendant Williams violated in this case—that is, whether an officer who is called to conduct a search incident to arrest is required to reevaluate the arresting officer's probable cause determination before conducting the search. *See, e.g.*, *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1260 (10th Cir. 1998).

Moreover, even if Defendant Padilla's assessment of Plaintiff's intoxication were ultimately incorrect, "a police officer who acts 'in reliance on what proves to be the flawed conclusions of a fellow police officer' may nonetheless be entitled to qualified immunity as long as the officer's reliance was 'objectively reasonable.'" *Baptiste*, 147 F.3d at 1260 (quoting *Rogers v. Powell*, 120 F.3d 446, 455 (3d Cir. 1997)). That reliance must be in good faith, however; it "does not protect deliberate, reckless, or grossly negligent reliance on the flawed conclusions of a fellow officer." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 882 (10th Cir. 2014). Here, the Sterling Defendants argue that "it was reasonable for Defendant Williams to accept Defendant Padilla's probable cause determination" because he (Defendant Padilla) notified Defendant Williams that (a) Plaintiff had been speeding; (b) Plaintiff did not perform the roadside maneuvers as a sober person would; (c) Defendant Padilla observed signs of impairment; (d) Plaintiff's breath test showed no signs of alcohol; and (e) Defendant Padilla had already Mirandized Plaintiff. [Doc. 61 at 7; Doc. 61-1 at 1, 3]. In her Response, Plaintiff does not dispute this information contained in the DIE. *See* [Doc. 65]. Notably, Plaintiff also does not explain how Defendant Williams' reliance on this information was objectively unreasonable. Rather, Plaintiff offers only conclusory

statements regarding the lack of probable cause and bad faith of Defendant Williams in proceeding with additional sobriety testing.  *See* [Doc. 59 at ¶¶ 106–14].

And although Plaintiff argues that "no reason existed for the tests" and no such reason was "stated in either Trooper Padilla's report or Officer Williams's report," [Doc. 65 at 6]; *see also* [Doc. 59 at ¶ 108], again, she does not dispute Defendant Williams's observation reflected in the DIE stating, *inter alia*, that her eyes were "bloodshot and appeared to have a reddened conjunctiva a common trait in cannabis users . . ." [Doc. 61-1 at 3]; *see also* [Doc. 159 at ¶¶ 67, 73–74 (referencing the DIE in support of allegations)].   Moreover, the Third Amended Complaint acknowledges that Defendant Padilla "claimed to have had probable cause to arrest" Ms. Ransaw, but then proceeds to allege that "there was no rational or legal reason for Williams to conduct the DIE."  [*Id.* at ¶ 75 (capitalization omitted)].[11]   Plaintiff does not explain, whether in the Third Amended Complaint or Response, why the reasons stated in the DIE would not provide an objectively reasonable basis for Defendant Williams's reliance on such information when he conducted the additional testing.  *See*, *e.g.*, [Doc. 61-1 at 3][12]; *cf. Amundsen*, 533 F.3d at 1200 n.4

---

[11] Ms. Ransaw also cites to the DIE in the Third Amended Complaint to support her allegation that Defendant Williams assessed her "as having bloodshot and reddened conjunctiva."  [Doc. 59 at ¶ 67].  The DIE is consistent with this allegation, including where it states, "I noticed Mrs. Ransaw's eyes were bloodshot and appears to have a reddened conjunctive a common trait in cannabis users." [Doc. 61-1 at 3].

[12] The DIE includes Defendant Williams' narrative regarding how he came to conduct the additional testing on Plaintiff:

I was contacted via phone by Trooper Chris Padilla in regards to completing a drug Influence evaluation on a subject he had Just arrested. Trooper Padilla had invoked Colorado Express Consent law and was responding to the hospital for the chemical test. [Defendant Williams] later met with Trooper Padilla at the Logan County Jail in regards to the evaluation. He advised that he had contacted the driver after observing her traveling 107 mph in a 75 mph zone. He observed signs of impairment in the driver and asked her to complete voluntary roadside manevers [sic]. She did not complete the maneuvers consistent with a sober person. Trooper

("We recognize that most cases addressing potential Fourth Amendment violations arising from traffic stops for suspicion of driving under the influence will involve additional indicia of intoxication beyond the suspect's driving pattern.  Simply because these indicia [of intoxication beyond the suspect's driving pattern] are often noted by officers and reviewing courts, however, does not mean that an officer must possess facts in addition to an improper driving pattern in order to reasonably suspect that the driver is under the influence of drugs or alcohol. Instead, our precedent counsels that driving conduct alone can establish reasonable suspicion of impairment, and thus, no additional indicium of intoxication is necessary to justify a roadside sobriety test." (citations omitted)).

In sum, the court finds that Ms. Ransaw fails to plausibly allege that Defendant Williams violated her rights under the Fourth Amendment to be free of unreasonable searches and seizures.

### 2.    Fourteenth Amendment

Ms. Ransaw also asserts her search-and-seizure claim against Defendant Williams under the Fourteenth Amendment.  *See* [Doc. 59 at 22].  The Fourteenth Amendment prohibits any State from depriving a person of life, liberty, or property without due process of law.  U.S. Const. amend. XIV, § 1.  Due process claims under the Fourteenth Amendment can take the form of a procedural or substantive violation: "procedural due process ensures the state will not deprive a party of property without engaging in fair procedures to reach a decision, while substantive due process ensures the state will not deprive a party of property for an arbitrary reason." *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000).

---

Padilla suspected Cannabis use but did not locate any paraphernalia in the vehicle that would confirm what type.

[Doc. 61-1 at 3].

As mentioned above, "as long as a claim is properly brought under the Fourth Amendment, a plaintiff may not assert a substantive or procedural due process claim under the Fourteenth Amendment." *Asten*, 652 F. Supp. 2d at 1206.  Therefore, Ms. Ransaw has failed to state a due process claim, and what remains of her search-and-seizure claim must be dismissed.

For all these reasons, I find that Ms. Ransaw has failed to state a claim against Defendant Williams for violations of the Fourth and Fourteenth Amendments.  Accordingly, Defendant Williams is entitled to qualified immunity on Plaintiff's Claim II alleging violations of the Fourth and Fourteenth Amendments.

### C.   Claim VI: Failure to Train/Supervise in Violation of the Fourteenth Amendment Against Defendant Kerr

Plaintiff brings her Sixth Claim against Defendant Kerr for failure to train and/or supervise in violation of the Fourteenth Amendment.  [Doc. 59 at ¶¶ 153–63].  Plaintiff alleges that Defendant Kerr, as "Chief of the Sterling Police Department, is a policy maker" who "establishes policies, procedures, customs and/or practices for its officers including but not limited to" Defendant Williams." [*Id.* at ¶ 154].  Plaintiff's allegations continue:

> KERR personally knew of WILLIAMS' practice of conducting DIEs on detainees in the custody of other law enforcement agencies.  KERR personally failed to provide constitutionally adequate policies, procedures, customs and/or practices, training and supervision to his direct subordinates and WILLIAMS that instructed and trained WILLIAMS not to conduct DIEs that are unnecessary due to previously administered drug evaluations by arresting officers.
>
> . . .
>
> KERR's personal failure to train and supervise resulted in WILLIAMS' violation of RANSAW's Fourth and Fourteenth Amendment rights by wrongfully searching her via unreasonable and unnecessary drug evaluations supporting her continued detention via a purposefully erroneous DIE claiming she was intoxicated when she was not and thereby participating directly in her continued detention without probable cause or reasonable suspicion.

[*Id.* at ¶¶ 156, 158].[13]

While Plaintiff asserts her claims against Defendant Kerr in his *individual* capacity, however, she does not argue that Defendant Kerr should be liable for any actions he personally took on December 7, 2019.  *See* [Doc. 59].  Indeed, Ms. Ransaw does not allege Defendant Kerr was present at her arrest or at the LCDC on December 7, 2019, nor does she allege that Defendant Kerr communicated with Defendant Williams that day, or at all.  *See* [Doc. 59].  Rather, Ms. Ransaw contends Defendant Kerr should be held liable for the actions of the officers he trained and supervised.  To establish liability against a supervisor under § 1983, Ms. Ransaw must show "a deliberate, intentional act by the supervisor to violate constitutional rights." *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996) (internal quotation marks omitted) (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992)).  She may do so by showing that Defendant Kerr "personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance." *Id.* (citing *Woodward*, 977 F.2d at 1400).  Because Ms. Ransaw fails to allege that Defendant Williams committed a constitutional violation, Plaintiff cannot show that Defendant Kerr directed Defendant Williams to commit a constitutional violation or that Defendant Kerr acquiesced in its continuation.  Thus, Ms. Ransaw's Sixth Claim against Defendant Kerr fails, and Defendant Kerr is entitled to qualified immunity. *See Hinkle*, 962 F.3d at 1226.

### III.   Defendant Powell's Motion to Dismiss [Doc. 62]

Ms. Ransaw asserts her Seventh Claim against Defendant Powell in his individual capacity for failure to train and/or supervise in violation of the Fifth, Eighth, and Fourteenth Amendments.

---

[13] Plaintiff does not allege facts regarding how Defendant Williams' testing was "purposefully erroneous."  *See* [Doc. 59].

[Doc. 59 at ¶¶ 164–79].  Generally, to hold a government official individually liable under § 1983, the plaintiff must establish that the defendant had personal involvement in the alleged constitutional violation.  *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011); *see also Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) ("It is particularly important that plaintiffs make clear exactly *who* is alleged to have done *what* to *whom*, as distinguished from collective allegations." (emphasis in original) (brackets, ellipsis, and internal quotation marks omitted)). Supervisory status alone does not create liability; rather, there must be an affirmative link between the constitutional deprivation and the defendant's personal participation.  *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (*citing Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)).  "Over time, the 'affirmative link' language has evolved to require three elements: (1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind."  *Laurienti v. Bicha*, No. 14-cv-02592-NYW, 2016 WL 496047, at *12 (D. Colo. Feb. 9, 2016) (citing *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010)).

In the Third Amended Complaint, Ms. Ransaw alleges that Defendant Powell, "as Logan County Sheriff under the authority of the Board of Commissioners of Logan County and as an elected law enforcement official, is a policy maker, supervisor, and trainer for the Logan County Sheriff's Office" who "establishes policies, procedures, customs and/or practices for its Deputies including but not limited to UNKNOWN LOGAN COUNTY SHERIFF'S DEPUTIES who are staffed and assigned to the LCDC."  [*Id.* at ¶ 164].  Ms. Ransaw alleges that Defendant Powell

> personally failed to provide constitutionally adequate policies, procedures, customs and/or practices, training and supervision to UNKNOWN LOGAN COUNTY SHERIFF'S DEPUTIES that adequately instructed them and supervised them to ensure that they knew that they could not and in fact would not restrict detainees' access to funds if bail was set, could not conduct unreasonable strip searches, must provide private toileting areas for inmates, must not force unreasonable and unnecessary medical tests such as pregnancy urinalyses, could not threaten to place a detainee on suicide watch where no evidence of self-harm intent exists, and more

broadly, that his Deputies could not inflict any form of punishment on pre-trial detainees who were otherwise in compliance with the rules of the LCDC.

[*Id.* at ¶ 168].

She also alleges that Defendant Powell failed to provide "[c]onstitutionally required training and supervision" resulting in the unidentified "Logan County Sheriff's Deputies' violation of Ransaw's Fifth and Fourteenth Amendment rights…" [*Id.* at ¶ 170 (capitalizations omitted)]. Plaintiff further alleges that Defendant Powell was aware of the allegedly unsafe conditions at LCDC regarding "the sexual privacy of detainees as a result of the proceedings in Baray v. Gallagher, Case No. 15-cv-00670," and "a public online petition to investigate the conditions at LCDC…[,]" [*id.* at ¶¶ 172–73]; and he "knew that his Deputies assigned to the LCDC were committing the constitutional violations," [*id.* at ¶ 175], and that any training provided to Deputies was "deliberately indifferent, reckless or grossly negligent," [*id.* at ¶ 176]. Based on these allegations, Ms. Ransaw claims that Defendant Powell violated her rights under the Fourth, Fifth and Fourteenth Amendments on the grounds that the unidentified Logan County Sheriff's Deputies subjected Plaintiff "to an unnecessary strip search, exposed toilet facilities, interfere[ed] with her ability to pay her bond, subject[ed] her to an unnecessary and unreasonable pregnancy urinalysis, and threaten[ed] to place her on unwarranted suicide watch." [Doc. 59 at ¶ 170]; *see also* [*id.* at ¶ 171].

In his Motion to Dismiss, Defendant Powell seeks to dismiss Plaintiff's claim on the basis that she "fails to plausibly allege an underlying constitutional violation by an identified employee/agent of the Logan County Sheriff's Office." [Doc. 62 at 7]; *see also* [*id.* at 5]. Defendant Powell further contends that, even if Plaintiff had sufficiently alleged a constitutional violation, the allegations fail to establish "the affirmative link between Sheriff Powell and the constitutional violation sufficient to maintain a failure to train and/or supervise claim against him."

[*Id.*].  Defendant Powell also asserts he is entitled to qualified immunity.  *See* [*id.* at 5].  The court finds Defendant Powell's second argument dispositive and respectfully agrees that the Third Amended Complaint fails to establish an affirmative link between Defendant Powell and the alleged violations.

Ms. Ransaw does not allege Defendant Powell personally participated in the incidents in question, nor does she allege Defendant Powell directed the unidentified Logan County Sheriff's Deputies to act as they did.  *See* [Doc. 59].  As such, this claim depends on whether Plaintiff sufficiently alleges that an affirmative link exists between the conduct of the unidentified Logan County Sheriff's Deputies and Defendant Powell's purported failure to train or supervise them. As mentioned, to establish an affirmative link, Ms. Ransaw must sufficiently allege three elements: (1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind.  I analyze each of these factors below.

*Personal Involvement.*  To establish personal involvement, a plaintiff must show that the supervisor actively participated in or acquiesced to the constitutional violation.  *Dodds*, 614 F.3d at 1195.  For instance, the following could each constitute sufficient personal involvement: a defendant-supervisor's exercise of control or direction over the constitutional violation; failure to supervise; knowledge of the constitutional violation and acquiescence to it; or promulgation, creation, implementation, or utilization of a policy that caused a deprivation of the plaintiff's rights.  *Id.*  Where personal participation is lacking, the plaintiff must allege the official acted knowingly or with deliberate indifference in permitting the violative conduct.  *Id.* at 1196.  Then, the plaintiff has to demonstrate that there was a causal connection and a culpable state of mind, *i.e.*, "the defendant set in motion a series of events that the defendant knew or reasonably should

have known would cause others to deprive the plaintiff of her constitutional rights." *Id.* at 1195–

96.

Here, even assuming without deciding that Ms. Ransaw states a cognizable constitutional

violation,[14] she still has not asserted any such allegations with respect to Defendant Powell to

---

[14] In her Response, Ms. Ransaw argues that she states plausible claims under the Fourth Amendment, "to be free from unreasonable search when they strip searched her without apparently following statutory protocols requiring supervisory permission to do so." [Doc. 66 at 6]. She cites to Colo. Rev. Stat. § 16-3-405(4) for the proposition that "the guard conducting the search must obtain written permission prior to a strip search" and "[n]o written permission was shown to Ms. Ransaw or mentioned to her before, during, or after the strip search." [*Id.*]. However, Colo. Rev. Stat. § 16-3-405(4) does not state that an officer must obtain written permission to conduct a strip search from the detainee. Rather, it states that "[e]very peace officer or employee of a police department or sheriff's department conducting a strip search <u>shall obtain the written permission of the police commander or an agent thereof or a sheriff or an agent thereof designated for the purposes of authorizing a strip search</u> in accordance with this section." Colo. Rev. Stat. § 16-3-405(4).

Ms. Ransaw also argues that "Defendants' testing of Ms. Ransaw's urine to determine if she was pregnant was equally violative of her Fourth Amendment rights" and "[t]here was simply no reason at all for this invasive search as Ms. Ransaw could have informed the Deputies of her status without the need for her to be humiliated by peeing on a completely unnecessary pregnancy test." However, Ms. Ransaw provides no authority for her position.

Further, Ms. Ransaw argues that her "additional claims relating to the exposure of her body including her requirement to use an exposed toilet are all properly Fourth Amendment claims," and cites to *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995); *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 575 (6th Cir. 2013) and *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). [Doc. 66 at 6–7]. However, apart from general propositions regarding a detainee's rights to privacy, Plaintiff does not explain how those cases address any of the constitutional violations she asserts in this action. *See* [*id.*]. Further, it is unclear to the court how such cases apply. For instance, in *Hayes*, the Plaintiff, a male inmate, alleged that "he was subjected to an unreasonable body cavity search that was videotaped by prison officials" and watched by 100 people, and "that prison officials improperly removed curtains from bathrooms, allowing inmates to be easily observed by female officers." *Hayes*, 70 F.3d at 1145. Here, Ms. Ransaw alleges her "strip search was conducted by a female officer," [Doc. 59 at ¶ 80], and does not allege that it was conducted in a public area, that she was exposed to other individuals during the search, or that her search presented any circumstances similar to the plaintiff in *Hayes*, *see generally* [*id.*]. Likewise, *Stoudemire* is unhelpful as that court explained that "[t]he location of the strip search made it more invasive" where the officer "did not block the window of the cell, the search did not take place in a private location" and "people in the hall could see [the plaintiff] naked, her prosthetic legs removed." *Stoudemire*, 705 F.3d at 573. And in *Bell*, the issue was "whether visual body-cavity inspections as contemplated by the [facility's] rules can *ever* be conducted on less than probable cause." *Bell*, 441 U.S. at 560. The Supreme Court held that "they can" based on the "[b]alancing [of] the

significant and legitimate security interests of the institution against the privacy interests of the inmates . . ." *Id.*

Ms. Ransaw also argues that she states a plausible claim under the Fifth Amendment "based upon Defendant's punishment of her without due process (e.g., without having been found guilty of any crime)," conduct which includes "Ms. Ransaw's forceable exposure of her body in the strip search, toileting publicly, and the urinalysis/pregnancy test." [Doc. 66 at 7]. Ms. Ransaw also contends her Fifth Amendment rights were violated when Deputies "threat[ened] to place her on suicide watch (extending her detainment and forcing her to wear a paper gown or nothing and remain under constant direct surveillance) merely because she did not wish to violate her closely held belief that consuming meat was not only unhealthy but morally wrong." [*Id.* at 8]. She further claims that her Fifth Amendment rights were violated based on "the Deputies' refusal to allow Ms. Ransaw to pay her bond when she arrived, refusal to repair her in-cell terminal, and insistence that she only use the jail collect-call system . . ." [*Id.*]. However, the Fifth Amendment is applicable to the federal government only, not to the individual states. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *Ward v. Anderson*, 494 F.3d 929, 932 n.3 (10th Cir. 2007) (noting that "only the Fourteenth Amendment imposes a due process requirement on state officials"). In this case, Plaintiff does not allege any facts implicating the federal government. As such, the Fifth Amendment does not apply. *See Wilson v. City of Lafayette*, No. 07-cv-01844-EWN-KLM, 2008 WL 4197742, at *6 (D. Colo. Sept. 10, 2008) (dismissing Fifth Amendment due process claims, where the plaintiff averred no facts relating to the federal government).

In addition, Ms. Ransaw argues that she states a plausible claim under the Eighth and Fourteenth Amendments based on her allegations that the unidentified Logan County Sheriff's deputies "denied her the ability to pay her bail promptly." [Doc. 66 at 8–9]. In the Third Amended Complaint, Ms. Ransaw alleges she "was denied the opportunity to pay her bond herself and to effectively contact anyone that could pay her bond on her behalf to effect her immediate release, in violation of Colo. R. Stat. § 16-4-102(b), which requires that 'barring extraordinary circumstances, a detainee must be permitted to pay bond within two hours of receiving the bond information.'" [Doc. 59 at ¶ 78]. However, Ms. Ransaw alleges that she *was* able to "alert" her husband about her detention the same night she was detained, and when her husband called the LCDC, he "was told it was too late to speak with [Plaintiff]," and she would be able to return his call at 6:00 a.m. the next morning. [*Id.* at ¶ 84]. Moreover, Colo. Rev. Stat. § 16-4-102 does not state that "a detainee must be permitted to pay bond within two hours of receiving the bond information," as Ms. Ransaw claims. *See* [Doc. 59 at ¶ 84]. Rather, it states that

> [u]nless extraordinary circumstances exist, the custodian of a jail shall release a defendant who is granted a cash bond as soon as practicable but no later than six hours after bond is set, after the defendant is physically present in the jail, and after the defendant or surety notifies the jail that the defendant or surety is prepared to post bond.

Colo. Rev. Stat. § 16-4-102(2)(e). In any event, the Third Amended Complaint does not plausibly allege Ms. Ransaw was denied a right to pay her bond, only that she did not get receive her preferred means of doing so. *See, e.g.*, [Doc. 59 at ¶ 77 ("RANSAW was not permitted to immediately pay the bond and was denied access to her purse and telephone to retrieve cash or arrange for bond."); *id.* at ¶ 79 ("RANSAW was only permitted to use the jail phone system and

demonstrate his liability for the alleged constitutional violations.  Plaintiff identifies no specific policy or practice implemented by Defendant Powell that resulted in any alleged constitutional violations.  Rather, she alleges generally that Defendant Powell "personally failed to provide constitutionally adequate policies, procedures, customs and/or practices, training and supervision to unknown Logan County Sheriff's Deputies that adequately instructed them and supervised them to ensure that they knew that they could not" engage in the specific conduct about which Ms. Ransaw complains.  [Doc. 59 at ¶ 168 (emphasis added) (capitalizations omitted)].

*Causal Connection.*  In addition, Plaintiff does not allege that Defendant Powell was responsible for restricting detainees' access to funds for bail, conducting strip searches, providing private toilets for detainees, administering pregnancy urinalyses to female detainees, or providing detainees with vegetarian meals, *see* [Doc. 159 at ¶¶ 170–71]; nor does she describe how Defendant Powell trained or failed to train the unidentified people who were responsible for administering those functions.  Instead, she alleges generally that Defendant Powell "failed to provide the foregoing Constitutionally required training and supervision as evidenced not only by the violations complained of herein but also by . . . apparently not being on site at the LCDC to personally supervise the staff during [Plaintiff's] detention there."  [*Id.* at ¶ 169].  These allegations are conclusory and fail to establish Defendant Powell's personal involvement in the alleged violations.  *Cf. Kemp v. Law.*, No. 11-cv-01368-LTB-KIT, 2012 WL 400286, at *7 (D. Colo. Feb.

---

that her calls would be made collect, a system now used almost exclusively by prison and jail systems and on information and belief no longer in wide popular use. This antiquated system resulted in confusion by recipients of the phone calls from RANSAW and delayed her ability to make bond and secure her release.")].  Likewise, Plaintiff's reliance on *Meechaicum v. Fountain*, 696 F.2d 790 (10th Cir. 1983) is misplaced, *see* [Doc. 66 at 9], as that case involved a habeas corpus petitioner's challenge to a state's denial of relief on bail pending extradition.  *See Meechaicum*, 696 F.2d 790.  In sum, the court does not find that Ms. Ransaw has established that the conduct she alleges constitute cognizable violations of her constitutional rights.

8, 2012) ("A defendant in a supervisory position can be personally involved in an alleged constitutional violation by his subordinates when he 'personally directed his subordinates to take the action resulting in the alleged constitutional violation' or 'when he had actual knowledge that his subordinates were committing the alleged constitutional violation and he acquiesced in its commission.'" (citations omitted)).

*Culpable State of Mind.*  Further, Ms. Ransaw has not alleged that Defendant Powell acted with the requisite state of mind.  Rather, she alleges Defendant Powell was aware of the allegedly unsafe conditions at LCDC regarding "the sexual privacy of detainees as a result of the proceedings in Baray v. Gallagher, Case No. 15-cv-00670," and "a public online petition to investigate the conditions at LCDC."  [Doc. 59 at ¶¶ 172–73].  The court does not find *Baray* or the online petition relevant in this action.

In *Baray*, the undersigned found that the plaintiff—who claimed she was repeatedly raped by an LCDC detention deputy (Gallagher) over the course of a two-month period in 2013 and that Defendant Powell knew or should have known of the same and took no action—had not alleged how Defendant Powell knew Gallagher posed a risk either to the plaintiff or to the facility's female inmate population.  Instead, the plaintiff only recited the elements of a supervisory liability claim. *See Baray*, Case No. 15-cv-00670-CMA-NYW, (D. Colo. Dec. 7, 2015) [ECF No. 39 at 10, 13–14].  Notably, in that case, the undersigned found that the plaintiff's allegations "offer[ed] only the recitation of the elements of supervisory liability."  [*Id.* at 14].  Accordingly, this court recommended that Judge Arguello grant Defendant Powell's and Logan County's motion to dismiss because the plaintiff's allegations were insufficient to state a claim for constitutional violations.  [*Id.*].[15]  Thus, *Baray* does not demonstrate that Defendant Powell was aware of facts

---

[15] The Parties stipulated to the dismissal of the case before Judge Arguello could rule on the

from which he could draw an inference that a substantial risk of serious harm existed with respect to the "sexual privacy" of detainees, including Plaintiff, and that he drew such an inference, as Plaintiff claims.  *See* [Doc. 59 at 172].

Likewise, the petition that Plaintiff cites in her complaint does not establish the requisite state of mind.  *See* [Doc. 59 at ¶ 173]; *see also* Change.org, *Open an investigation at Logan County Jail Sterling Co! Stop inmate abuse!!!*, https://www.change.org/p/department-of-justice-stop-inhuman-treatment-at-logan-county-detention-center (last visited Feb. 27, 2022).  Ms. Ransaw claims "[t]he petition sets forth several atrocious conditions at LCDC" including general "inhumane treatment, denial of medical care, taunting, punishment of detainees for the failure of LCDC sewage plumbing, denial of mops and cleaning equipment to clean up the sewage failure, denial of clean bedding, lack of running water and told to use toilet water, maltreatment of visitors, and destruction of inmate mail that complains about conditions."  [Doc. 59 at ¶ 173].  However, even assuming the petition contains such claims, Ms. Ransaw does not allege any facts to show that Defendant Powell knew about the petition.  *See* [*id.*].  And notably, Ms. Ransaw does not explain how any of the accounts she cites from the petition relate to her claims here.  *Cf.* [*id.* at ¶ 168 (alleging that Defendant Powell failed to ensure that the unidentified Sheriff's Deputies "knew that they could not . . . restrict detainees' access to funds if bail was set, could not conduct unreasonable strip searches, must provide private toileting areas for inmates, must not force unreasonable and unnecessary medical tests such as pregnancy urinalyses, could not threaten to place a detainee on suicide watch where no evidence of self-harm intent exists, and more broadly, that his Deputies could not inflict any form of punishment on pre-trial detainees who were otherwise in compliance with the rules of the LCDC")].

---

undersigned's Recommendation. *See Baray,* [ECF No. 43; ECF No. 15].

I find that Ms. Ransaw has not sufficiently alleged an affirmative link between the asserted constitutional violations and Defendant Powell, and therefore fails to state a claim against Defendant Powell.  Accordingly, Defendant Powell is entitled to qualified immunity.  *See, e.g.*, *Chavez v. Polis*, No. 20-cv-03798-LTB-GPG, 2021 WL 2433961, at *3 (D. Colo. Apr. 19, 2021) ("With respect to Defendants Williams and Maul, Mr. Chavez alleges only that they are responsible for overall management, supervision, and control of DOC facilities. He does not allege facts that demonstrate personal involvement, a causal connection to the constitutional violation, and a culpable state of mind."), *report and recommendation adopted,* 2021 WL 2433960 (D. Colo. May 12, 2021), *aff'd*, 21-1221, 2021 WL 4979252 (10th Cir. Oct. 27, 2021).

## IV.    Leave To Amend

Finally, Plaintiff argues that she should be granted leave to amend if the court grants the Motions to Dismiss.  [Doc. 64 at 18–19; Doc. 65 at 15–16; Doc. 66 at 18–19].  Defendants object to Plaintiff's request.  [Doc. 70 at ¶ 25]; *see also* [Doc. 67 at 5 n. 1; Doc. 71 at 10 n.2].

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  Whether to allow amendment is within the trial court's discretion.  *Burks v. Okla. Publ'g Co.,* 81 F.3d 975, 978–79 (10th Cir. 1996).  "A court may deny leave . . . on account of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment." *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1101–02 (10th Cir. 2019) (internal quotations omitted).  The party opposing the motion to amend has the burden of proving that the amendment should be refused on one of these bases.  *Acker v. Burlington N. & Santa Fe R. Co.*, 215 F.R.D. 645, 654 (D. Kan. 2003); *see also Corp. Stock Transfer, Inc. v. AE Biofuels, Inc.*, 663 F. Supp. 2d

1056, 1061 (D. Colo. 2009) (holding that the non-moving party bears the burden of showing that the proposed amendment is sought in bad faith, that it is futile, or that it would cause substantial prejudice, undue delay or injustice).

I find that leave to amend is not appropriate here. First, notwithstanding the improper inclusion of Plaintiff's requests for such relief in her Responses, *see* D.C.COLO.LCivR 7.1(d), Ms. Ransaw does not explain why she should be granted leave to amend the Third Amended Complaint, other than "Plaintiff should be permitted to amend to cure any deficiencies identified by the Court." *See* [Doc. 64 at 18; Doc. 65 at 16; Doc. 66 at 18]. Second, on August 25, 2021, the court granted Plaintiff's Motion to Amend [Doc. 48, filed June 1, 2021]. *See* [Doc. 58]. All Defendants opposed the then-proposed amendments, arguing that such amendments would be futile. *See* [Doc. 50 at 5–12; Doc. 51 at 4–5; Doc. 52 at 4–6]. Relevant here, in the court's Order granting the Motion to Amend, I explained that "the most prudent course of action is to defer the Parties' futility arguments for resolution of any forthcoming motions to dismiss the Third Amended Complaint." [Doc. 58 at 10–11]; *see also* [*id.* at 11 ("The fact that Defendants have already filed Motions to Dismiss does not change the court's conclusion that full briefing on a renewed motion to dismiss is the proper way to address Defendants' futility arguments.")]. Given (1) the court's foregoing advisement that full briefing on the instant Motions to Dismiss is the proper way to address Defendants' futility arguments; (2) that Plaintiff has already amended her Complaint twice thus far; and (3) Plaintiff's lack of explanation as to why she seeks leave to amend the operative Third Amended Complaint yet again, I find that leave to amend is not appropriate here.[16]

---

[16] Thus, I need not reach the futility arguments raised by the Sterling Defendants and Defendant Powell, *see* [Doc. 70 at ¶ 25; Doc. 67 at 5 n.1], or any argument by the State Defendants that any proposed amendments would be unduly delayed, *see* [Doc. 71 at 10 n.2 (stating that Plaintiff

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)     The Sterling Defendants' Motion to Dismiss [Doc. 61] is **GRANTED**;

(2)     Defendant Powell's Motion to Dismiss [Doc. 62] is **GRANTED**;

(3)     The State Defendants' Motion to Dismiss [Doc. 63] is **GRANTED IN PART and DENIED IN PART**;

(4)     Plaintiff may **PROCEED** on only Claim I asserted against Defendant Christopher Padilla arising from her warrantless arrest;

(5)     Claim I and Claim V arising from Plaintiff's Initial Stop and Investigative Detention/Field Sobriety Testing are **DISMISSED with prejudice**;[17]

(6)     All other claims against all other Defendants in the Third Amended Complaint are **DISMISSED** without prejudice;

(7)     The stay is **LIFTED**; and

(8)     A Telephonic Scheduling Conference in this matter is **SET** for **May 25, 2022 at 9:00 a.m.**  All participants shall use the following dial-in information: 888-363-4749, Access Code: 5738976# to participate at the designated time.  The Proposed Scheduling Order is due **May 18, 2022**.

DATED:  March 10, 2022                    BY THE COURT:

_____
Nina Y. Wang
United States Magistrate Judge

---

"missed the deadline for amendment of pleadings, which required amendments on or before August 25, 2021").

[17] A dismissal with prejudice of a complaint that fails to state a claim under Rule 12(b)(6) is appropriate only when "granting leave to amend would be futile."  *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).  Here, because the court has determined that the facts as alleged in the Third Amended Complaint establish that Defendant Padilla had sufficient reasonable suspicion to conduct the Initial Stop and Investigatory Detention/Roadside Sobriety Tests, this court dismisses these portions of Claim I and V with prejudice.